## Case No. 11,094.

PHILIPS v. HATCH.

[1 Dill. 571; 3 Am. Law T. Rep. U. S. Cts. 191;
4 West. Jur. 399.] [1]

Circuit Court, D. Iowa. 1871.

REBELLION —DURATION—CONTRACTS.

1. From the nature of the question, which is regarded as political and not judicial; from the fair implication of the acts of congress; and from the uncertainty and confusion which would ensue from any other rule, *held*, that in contemplation of law, the late Rebellion continued in existence, in the state of Texas, until it was declared to be at an end, by the president in his proclamation of August 20, 1866 (14 Stat. 814); and that the courts would not inquire as a matter of fact in each case when the Rebellion terminated, or hostilities ceased, but would be governed in determining it by the decision of the political department of the government.

[Cited in U. S. v. One Thousand Five Hundred Bales of Cotton, Case No. 15,958.]

2. A contract made without any license or authority from the government, during the pendency of the Rebellion, between a resident of a state in insurrection and a state which "maintained a loyal adhesion to the Union" is void, both by the doctrines of international or public law, applicable to the late civil conflict, and by force of express legislative declaration.

[Cited in Williams v. Mobile Sav. Bank, Case No. 17,729; Brown v. Hiatt, Id. 2,011.]

[Cited in Rice v. Shook, 27 Ark. 137.]

3. Even after the war has terminated, the defendant in an action founded upon such a contract may plead the illegality thereof as a defence.

4. The principles of public law applicable to a state of war inter gentes have in general, in the absence of conflicting congressional legislation, been applied to legal questions arising out of the civil war between the United States and the so-called Confederate government.

5. Various statutes of congress, and proclamations of the president, relating to the status of the insurrectionary states, cited and commented on by Dillon, Circuit Judge.

The questions in the case arise on a demurrer to the answer. The plaintiff, in his petition alleges, that at the time of bringing his action, and at the time when the contract in suit was entered into, he was a citizen of the state of Texas, and that the defendant was, at said times, a citizen of the state of Iowa. The contract declared on is a promissory note made by the defendant to the plaintiff, and purports on its face to have been made in the "state of Texas," in the "county of Montgomery," therein, on the first day of January, 1866. The note contains a recital that it is secured by a deed of trust; and the petition contains an averment that the deed of trust has been executed and the property sold, and the proceeds of the sale (which was made out of court under a power contained in the instrument) credited on the note. To recover the balance, after allowing the credit, this action is brought. Among other defences, not necessary to be specially

mentioned, the defendant pleads, in substance, the following: That at the time of the making of the note sued on, the plaintiff was a citizen and inhabitant of the state of Texas, and the defendant was a citizen and resident of the state of Iowa. The answer refers to the act of congress, of July 13, 1861 [12 Stat. 255], and the proclamations of the president hereafter mentioned, and alleges that the president did declare the state of Texas and the inhabitants thereof to be in actual rebellion against the United States, and that such rebellion continued to exist until the 20th day of August, 1866, when, by proclamation of the president, the state of rebellion theretofore existing in the state of Texas was declared to be suppressed. The answer also alleges that the plaintiff was a rebel, and gave aid and comfort to the enemies of the United States in armed rebellion during the time aforesaid; that he never took the oath of allegiance; and never received any permit to carry on trade or commercial intercourse from the proper or constituted authorities of the United States; wherefore, the defendant says the contract in suit is null and void, and he prays judgment accordingly. The plaintiff demurs, assigning as a ground therefor, that the facts pleaded do not, in law, make the note void.

[2] [Certain acts of congress and proclamations of the president of the United States, bearing upon the controversy may be here conveniently referred to. On the 19th day of April, 1861, the president issued his proclamation declaring that he had set on foot a blockade of the ports of certain states, including the state of Texas, because of the existence therein of an insurrection against the government of the United States. 12 Stat. 1258. On the 13th day of July, 1861 (12 Stat. 255, 257, § 5), the congress of the United States passed an important act, by which it was provided that the president, in certain cases, may declare the inhabitants of a state, or any section or portion thereof, to be in a state of insurrection "and thereupon," it is enacted, "all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States shall cease and be unlawful, so long as such condition of hostility shall continue; and all goods, etc., coming from such state or section into the other parts of the United States, and all proceeding to such state or section, by land or water, shall * * * be forfeited to the United States." Then follows a proviso that the president may, in his discretion, license and permit intercourse "to be conducted and carried on only in pursuance of rules and regulations prescribed by the secretary of the treasury." Pursuant to this act of congress, the president by his proclamation of the 16th day of August, 1861 (12 Stat. 1262), declared the state of Texas, with others, to be in a

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 3 Am. Law T. Rep. U. S. Cts. 191, contains only a partial report.]

[2] [From 4 West. Jur. 399.]

state of insurrection, and also proclaimed all unlicensed commercial intercourse to be unlawful. The power given to the president by the 5th section of the act of July 13, 1861, above cited, to license trade, was subsequently repealed except in certain cases. 13 Stat. 377, § 9. And see proclamation of April 2, 1863, repealing exceptions in the proclamation of August 16, 1861 (13 Stat. 730). By the act of July 17, 1862 (12 Stat. 589), it is provided that any person, in the states named, engaged in the rebellion, or aiding it, who fails, for 60 days after public warning or proclamation by the president, to cease to aid the rebellion and return to his allegiance, shall forfeit his property to the United States, the same being considered and "condemned as enemies' property" (sections 6 and 7). On the 2d of April, 1866, the president issued his proclamation, "declaring that the insurrection which heretofore existed in the states of Georgia, South Carolina, Virginia, North Carolina, Tennessee, Alabama, Mississippi, and Florida is at an end, and is henceforth to be so regarded." 14 Stat. 811. It will be noticed that the state of Texas was not included in this proclamation, but it was included in the like proclamation of August 20, 1866. 14 Stat. 814. This last proclamation recites in terms that the insurrection in Texas was not suppressed at the date of the former proclamation (April 2, 1866), and it is then (August 20, 1866), declared "to be at an end, and to be henceforth so regarded," in the said state of Texas, as in the other states named in the proclamation of April 2, 1866. On the 13th of June, 1865 (13 Stat. 763), the president issued his proclamation declaring that restrictions on trade east of the Mississippi river, with certain exceptions, be removed. On the 17th of June, 1865 (13 Stat. 765), the president issued his proclamation appointing a provisional governor for Texas, but containing no declaration of removal of restrictions on trade and intercourse therein, which had before been declared.] [2]

Withrow & Wright, for demurrer.
Nourse & Kauffman, opposed.

Before DILLON, Circuit Judge, and LOVE, District Judge.

DILLON, Circuit Judge. The contract which is here sought to be enforced was made between a citizen and resident of the state of Iowa, and a citizen and resident of the state of Texas, within the latter state, after the proclamation of the president was issued, declaring that state to be in rebellion against the United States, and before his proclamation declaring the insurrection therein to be suppressed and at an end. It appears from other portions of the record that the consideration of the note declared on was a sale by the plaintiff and a purchase by the defendant, through an attorney in fact who signed the

defendant's name to the note, of certain property, and that the note was secured by a deed of trust, and the property sold in pursuance of a power of sale contained in that instrument. The question made by the demurrer is, whether a note executed under these circumstances is valid and enforceable in the courts of the United States after the rebellion or civil war referred to in the answer is at end.

The first point necessary to be noticed is, when is the rebellion or civil war in Texas to be considered as having ended? It is a well known historical fact, which it is supposed the court may judicially notice, that the armies of the Rebellion surrendered to the force of the United States government early in the year 1865. General Lee surrendered to General Grant, April 9, 1865. Johnston surrendered April 26, 1865, and Kirby Smith, May 26, 1865,—dates, it will be observed, prior to the date of the note in suit. It is maintained by the plaintiff that the war was at an end before the note was made, and hence it is not governed, in any event, by rules of law applicable to contracts made pending a war between citizens of the opposing belligerents.

On the other hand, it is maintained by the defendant that it is not competent for the courts to inquire when as a matter of fact the Rebellion terminated, but that the courts must follow and be governed in this respect by the decisions of the political departments of the government, and if so then the Rebellion was in existence in the state of Texas until the president declared it to be at an end, which was on the 20th day of August, 1866, posterior to the date of the note, which is the foundation of the present action.

By the act of July 13, 1861 (12 Stat. 255), the president was made the judge of what states or portions of states were in insurrection, and he was authorized to declare that fact by proclamation. The act provides that "thereupon all commercial intercourse * * shall cease and be unlawful so long as such condition of hostility shall continue." The president's proclamation of August 16, 1861 (12 Stat. 1262), declared that commercial intercourse between the two sections "is unlawful, and will remain unlawful until such insurrection shall cease or has been suppressed."

In the opinion of the president, the Rebellion, in the state of Texas, had not ceased when he issued his proclamation of April 2, 1866 (14 Stat. 811), and it was not until the 20th day of August, 1866, that the president officially declared it to be at an end, and to be henceforth so regarded. Since the president, and not the courts, was empowered to decide when a state was in condition of insurrection, it would seem a fair implication from the act, in the absence of a contrary provision by congress on the subject, that the president, and not the courts, should determine how long the condition of hostility

continued which rendered unlicensed intercourse unlawful.

If the date fixed by the president's proclamation does not govern, then that proclamation is, in this respect, wholly nugatory, and there is no certain guide for the courts to determine when the Rebellion is to be considered at an end. From the nature of the question, which is political and not judicial; from the fair implication of the act of July 13, 1861; from the confusion and uncertainty which would ensue from adopting any other rule, it is the opinion of the court that in the contemplation of law, the Rebellion in the state of Texas must be considered as being in existence until the president declared it to be at an end in the proclamation of the 20th day of August, 1866. This view receives no little support from the judgment of the supreme court in the recent case of U. S. v. Anderson, 9 Wall. [76 U. S.] 56, which holds, that within the meaning of the abandoned and captured property act of March 12, 1863, the Rebellion was not suppressed until August 20, 1866. Congress has also recognized the date fixed in the proclamation of August 20, 1866, as that at which the Rebellion closed. Act March 2, 1867, 14 Stat. 422, § 2; U. S. v. Anderson, supra.

The contract in suit then, is to be regarded as having been made during the existence of the Rebellion, and between a resident of a state in insurrection and a resident of a state which, in the language of the abovementioned proclamation of August 16, 1861, "maintained a loyal adhesion to the Union and the constitution." Being so made, is it valid or void? The late civil conflict, in view of the peculiar organization of this government, composed of states united into a national union, and in view of the de facto organization of a portion of these states into a confederacy, which raised and maintained for four years large armies, whose dominion was marked by lines of bayonets and bristling fortifications, within which the laws and authority of the national government were practically overthrown, presented legal questions as to its nature and effect, equally novel and difficult.

Were the rules and doctrines of international law at all applicable to this conflict, or were the questions arising out of it to be wholly determined by the municipal law? This general question first came before the supreme court in the Prize Cases, 2 Black [67 U. S.] 635, 1862. It has since been frequently before that tribunal. See The Venice, 2 Wall. [69 U. S.] 258; Mrs. Alexander's Cotton, Id. 404; The Hampton, 5 Wall. [72 U. S.] 372; The William Bagley, Id. 377; The Onachita Cotton, 6 Wall. [73 U. S.] 521; Hanger v. Abbott, Id. 532; Coppell v. Hall, 7 Wall. [74 U. S.] 542; McKee v. U. S., 8 Wall. [75 U. S.] 163; The Grapeshot, 9 Wall. [76 U. S.] 129.

These cases all apply, or declare to be applicable, to the Rebellion, the general doctrines of public law which govern in wars between independent nations. Of course, the authority of congress to modify these doctrines as applied to states in insurrection and the inhabitants thereof would not, probably, be disputed. In determining questions arising out of the Rebellion, the courts of the United States will first inquire what legislation has the congress of the United States enacted respecting such questions. If any, the courts will be governed by it so far as it is within the constitutional competency of congress. If none, then the general rules and doctrines of international law will be resorted to by the courts to determine the rights of the parties. What exceptions to the application of these rules and doctrines, arising out of the peculiar nature of our government and of the war, must necessarily, or should properly be made, cannot well be determined in advance.

Whether the question of the right of the parties to make the contract in suit be decided by the principles of public law applicable to a state of war inter gentes, or by the provisions of the act of congress, the result is the same.

In the Prize Cases [supra], Mr. Justice Nelson thus states some of the consequences resulting from a state of war between two countries: "The people of the two countries immediately become the enemies of each other; all intercourse, commercial or otherwise, unlawful; all contracts existing at the commencement of the war suspended, and all made during its existence utterly void."

There is no dispute among publicists, jurists, or courts, respecting the soundness of the proposition that all commercial intercourse, and all contracts between the subjects or citizens of different powers, or opposing belligerents, are wholly invalid. This principle of public law is vindicated by such masterly reasoning, and fortified with so much authority and research by Chancellor Kent, in his celebrated judgment in Griswold v. Waddington, 16 Johns. 438, that it is not necessary to do more than to refer to it. See, also, Kent, Comm. 67; Hall. Int. Law, 356; Billgerry v. Branch [19 Grat. 393]; Willison v. Patteson, 7 Taunt. 439; S. C., 1 Moore, C. P. 133; Ex parte Boussmaker, 13 Ves. 71; Flindt v. Waters, 15 East, 260; The Hoop, 1 C. Rob. Adm. 196, 200; Potts v. Bell, 8 Term R. 556; The Rapid, 8 Cranch [12 U. S.] 155; The Prize Cases, 2 Black [67 U. S.] 635.

But in the case at bar it is not necessary to resort to the general doctrine of public law, for the making the contract was forbidden by the abovementioned act of congress of July 13, 1861, prohibiting all unlicensed intercourse between the inhabitants of states and sections in insurrection, and the rest of the United States. Speaking of this act, Mr. Justice Davis, delivering in a recent case the opinion of the supreme court of the United States, says: "It is a familiar principle of public law that unlicensed business intercourse with an enemy during time of war is not permitted. Congress, therefore, in recognition of this

principle, when it declared, on the 13th day of July, 1861, that commercial intercourse between the seceding states and the rest of the United States should cease and be unlawful after the proclamation of the president that a state of insurrection existed, authorized the president in his discretion, to license trade. But in so far as it was licensed it was to be conducted in accordance with regulations prescribed by the secretary of the treasury. The president proclaimed the fact of insurrection, and provided for limited commercial intercourse, and the secretary of the treasury fixed the manner in which the intercourse should be carried on." McKee v. U. S., 8 Wall. [75 U. S.] 163, 166.

So, in reference to the effect of the act of July 13, 1861, and the proclamation of August 16, of the same year, Mr. Justice Swayne says that thereby "commercial intercourse between the inhabitants of territory in insurrection and those of territory not in insurrection, except under the license of the president, and according to regulations prescribed by the secretary of the treasury, was entirely prohibited." The Onachita Cotton, 6 Wall. [73 U. S.] 521, 531. See, also, U. S. v. Lane, 8 Wall. [75 U. S.] 184; Coppell v. Hall, 7 Wall. [74 U. S.] 542. In the case last cited, which was one arising out of the Rebellion, the court remarks: "The payment of money by a subject of one of the belligerents in the country of the other is condemned, and all contracts looking to that end are illegal and void."

It is also settled that even after the war has terminated the defendant in an action founded upon a contract made in violation of the rule of law which forbids the making of a contract with an enemy, may set up the illegality of the transaction as a defence. Hanger v. Abbott, 6 Wall. [73 U. S.] 532, 535, per Clifford, J.; Willison v. Patteson, 7 Taunt. 439.

It is, therefore, the opinion of the court that the answer is sufficient, and the demurrer thereto is overruled.

Demurrer overruled.

See Brown v. Hiatt [Case No. 2,011]; Levy v. Stewart, 11 Wall. [78 U. S.] 244.