### RICE v. SHOOK et al.

STATES IN REBELLION—*Status of inhabitants.*—During the late civil war, the *status* of the inhabitants of the insurrectionary States, outside of the territory therein held by the United States, was that of public enemies of the government.

LAW OF NATIONS—*Intercourse interdicted.*—During war, all trade and intercourse between the citizens or subjects of one of the belligerent States or powers, with those of the other, are interdicted.

CONTRACTS—*Against public policy invalid.*—All contracts made with a public enemy, without the license or permission of the government, are, upon the grounds of public policy, invalid and void.

COURTS—*Of what, will take judicial notice.*—Courts will take judicial notice of the fact that certain localities or portions of a State, in insurrection, were in the possession and under the custody of the forces of the United States, but will not infer therefrom, that individuals resided there, or in the territory over which the government had re-established its authority, as against the averments of a plea that they were public enemies.

APPEAL FROM INDEPENDENCE CIRCUIT COURT.

Hon. ELISHA BAXTER, *Circuit Judge.*

*Byers & Cox, Rice & Benjamin,* for Appellants.

*Watkins & Rose,* for Appellees.

During the prevalence of a war, the citizens of the hostile States are incapable of entering into a valid contract with each other. 7 *Peters,* 586; *Story on Prom. Notes, Sections* 94 *and* 95.

The civil war between the United States, and the seceding States, involved the usual consequences and rights of international wars. *The Sarah Star, Bl. Pr. Cas.,* 69.

The war continued, and was not ended till August 20th, 1866. See opinion by *Casey, C. J., U. S. Ct. claims, Grossmayer vs. U. S. Dec'r. T.* 1868; *President's Proc., Aug.* 20, 1866.

HARRISON, J.—This was an action upon a promissory note for $400, executed to the appellant by the appellees, and dated at Little Rock, February 7th, 1865.

The only question in the case is raised by a demurrer to the defendants' plea, which alleges that the note was executed during the late civil war, and that, at the time, the plaintiff was a citizen of the State of Minnesota, and the defendants were citizens of the State of Arkansas, adhering to and aiding the rebellion, and public enemies of the United States, and that the execution of the same was not by any license or permission of the United States.

That, during the war, the *status* of the inhabitants of the insurrectionary States, outside of the territory therein, held by the United States forces, was that of public enemies of the government, was conclusively settled by the Supreme Court of the United States, in the Prize cases, 2 *Black*, 635, and the case of *Mrs. Alexander's cotton*; 2 *Wal.*, 404; and see also, *Phillips vs. Hatch*, 1 *Dill.*, *C. C. Rep.* 571; and it is a principle of public law, recognized by all nations, that, during war, all trade and intercourse between the citizens or subjects of one of the belligerent States or powers, with those of the other, are interdicted, except by the license or permission of the government, or in the mere exercise of the rights of humanity. Consequently, all contracts made with a public enemy, without the license or permission of the government (no contract can arise from the mere exercise of the offices of humanity), are, upon the ground of public policy, invalid and void.

Although the court will judicially notice that, at the date of the note, Little Rock and a large part of the State were and had been, for some considerable time previously, in possession of the forces of the United States, yet no such inference, as that the defendants resided there or in the territory over which the government had re-established its authority, and could not longer be regarded as enemies, can be drawn therefrom, in opposition to the direct averment of the plea that they were public enemies. The plea was good and the demurrer to it was, therefore, properly overruled. Judgment affirmed.

McCLURE, C. J., dissenting.—The case of *Hatch vs. Phillips*, (1 *Dill. C. C. R.*, 571), is cited by the majority in support of their position. The effect of the decision in *Hatch vs. Phillips* is, that a state of war existed, in Texas, from the date of the President's proclamation (August 16, 1861,) until the 20th of August 1866, at which time the President declared the rebellion at an end in the State of Texas. I presume the object in citing this case was to indirectly assert the fact, that the rebellion in Arkansas did not close until April 2, 1866, and that a state of war continued in Arkansas from August 16, 1861, to that time, such as rendered all contracts between citizens of the United States and the State of Arkansas absolutely void. From all conclusions of this kind, I most respectfully dissent.

It was held in the case of *Mrs. Alexander's cotton* (2 *Wal.* 419), that " all the people of each State and district, in insurrection against the United States, must be regarded as enemies, *until* by the action of the *legislature* and the *executive,* or otherwise, that relation is thoroughly and permanently changed." This principle of law is correctly stated, and I do not pretend to refute it. The point of disagreement between the majority of the court and myself is, that they recognize the 2d of April, 1866, as the day on which the restrictions on trade were removed, while I fix it at another and different date. As will be seen by the language of Chief Justice Chase, in the case of *Mrs. Alexander's cotton*, trade with persons in the insurrectionary districts, by persons claiming or having a residence or citizenship, outside of such an insurrectionary district, is interdicted, not until the close of the war or insurrection, but " *until the legislature and the executive otherwise direct.*" The general law of nations, in matters of this kind, in relation to trade with a public enemy, during a period of war, has no application whatever to the condition of affairs existing between the United States and the States in rebellion, save, in those instances, where there was an absence of positive law, or orders made by an officer authorized by law to

declare what relations should exist between the citizens of the United States and the citizens of the insurrectionary States.

I insist, that not only Congress, but the Executive of the United States, in the manner and through officers designated by the law and war-making power of the United States, changed the general rule, that during war all trade by citizens of other States, with the citizens in rebellion, was suspended and inhibited until the close of the war.

On the 16th of August, 1861, the President of the United States, by proclamation, interdicted all commercial intercourse between the loyal States of the United States and the disloyal States. An act of July 13, 1861, authorized the President to make such a proclamation, and to license and permit commercial intercourse with any part of said State or section (in rebellion) with the inhabitants so declared to be in insurrection, and also, authorized the Secretary of the Treasury to appoint such officers, and make such regulation in relation to such trade as might be necessary. The Secretary of the Treasury, by virtue of said authority, divided the territory into districts. Under the second paragraph we find that Arkansas, or that portion of it "*occupied by National troops operating from the North,*" is placed within the limits of the first special agency, and that part of Arkansas, "*occupied by National troops operating from the South,*" is placed within the limits of the fifth special agency.

The present Chief Justice of the United States, was, at the time these orders were made, Secretary of the Treasury, and in his instructions to the agents of the special districts thus created, he directs the agents as follows: "*First,* To allow within districts in insurrectionary States, when the authority of the government is so completely re-established, in your judgment, sanctioned by that of the commanding General, as to warrant it, and between such districts and loyal States, *the freest commercial intercourse, compatible with prevention of supplies to persons within rebel lines.*"

This order was issued long before the execution of the note sued on in this case, and clearly discloses the policy of the government in relation to trade with persons in rebellion. The question now arises: Was the authority of the United States so completely re-established as that the "freest commercial intercourse," between the parties to this suit, would result in "furnishing supplies to those persons in rebellion." The majority of the court say, they will "judicially notice that, at the date of the note, Little Rock and a large part of the State were, and had been for some time previously, in possession of the forces of the United States." It seems to me, if they take judicial cognizance of such a fact, that the majority might have gone a step farther, and have taken judicial cognizance of the different acts of Congress, and orders made in pursuance thereof, by the officers therein designated. It is a matter of public notoriety that the federal forces took possession of the city of Little Rock, where the note sued on was executed and delivered, in September, 1863, and that a continuous possession has been held down to the present time, against persons claiming to be public enemies. Chief Justice Chase, while he was yet Secretary of the Treasury, in speaking of restrictions upon intercourse with those in rebellion said: "There does not seem to me to be so much danger in intercourse which does not involve the furnishing of supplies." It appears, from one of the pleas of the appellees, that the consideration for the note, sued on, was for legal services performed by the appellant toward the appellees, in getting them out of prison. How such service or such intercourse would endanger, or interfere with the prosecution of the war, waged by the United States against these persons in rebellion, I am at a loss to see. If this note is void, it was only so, because the giving of it was contrary to public policy, and when I say public policy, I mean the public policy of the government of the United States. The majority have said that they will take judicial cognizance of the fact, that Little Rock, and a considerable part of the

State were, at the time of executing and delivering the note to the appellant, held and occupied by the national forces. Then, I ask, why not take cognizance of the fact, that the appellees were within the lines of the federal army and subject to federal laws and authority, when this note was executed? It was held in the case of the *United States vs. Hayward*, 2 *Gall.*, 485, that by the conquest and occupation of Castine by the British, that the American citizens, residing there, were released from all allegiance to the United States government, so long as the place was held by English troops; but the moment the authority of the United States was sufficient to afford protection to its citizens, that moment their allegiance was due to their government, and the citizen could no more claim to be a public enemy of the United States, than a citizen of Arkansas, who was in the late rebellion, could claim it to-morrow. While it may be conceded that the citizen of Arkansas, who was within the lines and protection of the army of insurgents, owed his allegiance to the party in power, it does not follow that such a person may come within the lines of the army of the United States and the protection of the government, and there plead his treason to defeat a legal and valid obligation.

In the early part of 1864, the loyal people of Arkansas assembled in convention at the city of Little Rock, where the note was executed and delivered that is now the subject of this suit, and formed a convention. Members of the legislature were elected, as well as the officers of the executive and judicial departments. The government, thus formed, received the fostering care of the President of the United States, and was protected by federal bayonets from the time of its creation until July of 1868, at which time that government gave way to the present. The XIIIth Article of Amendment to the Constitution of the United States, was submitted to the legislature for ratification, and by it ratified in April of 1865. The authority and power of the United States government was as completely and firmly established at the city

of Little Rock, where the note was given, and at the time it was given, as it is to-day. The mistake into which the majority of the court have fallen is, in accepting it as a fact, that the armies of the rebellion held possession of the State of Arkansas in February, 1865. It is a well known fact, and one of which judicial notice may be taken, that the courts were open for the transaction of judicial business, at this city, as early as September of 1864. The presumption arising from this fact is, that the courts were open by the permission, assent and consent of the United States authorities. This point conceded, and another presumption follows, and it is, that the employment of counsel to defend and prosecute causes therein was not interdicted. One of the pleas filed in this case discloses the fact, as has already been stated, that the consideration of the note was legal services performed by the appellant toward and for the appellees. The plea, however, does not disclose whether the services were performed before the State courts or a military tribunal; nor does it make any difference where they were performed, if the United States authorities allowed the appellant to appear as counsel for the appellees, for the toleration of the appearance would imply a consent on the part of the government, that the appellees might employ him.

I have carefully examined the case of *Phillips vs. Hatch*, 1 *Dill.*, 571, and an examination of the facts in that case discloses, that the contract was made *within the lines of the insurgents*, and not within the lines of the federal army, as was the fact in this case. The seizure of Mrs. Alexander's cotton was justified upon the ground that the seizure was made *within the lines of the enemy*. The brig Amy Warwick, was condemned as a prize on the ground that the owners, of the cargo, resided *within the lines of the enemy*. The vessel Hiawatha and her cargo were condemned as a prize for similar reasons. The Crenshaw was returned to the claimants because they lived *within the federal lines*. In my research, I have been unable to find a single case where property was held as a

prize capture, where the owner lived within the federal lines; nor have I been able to find a single case, where a contract has been held void where it was executed within the federal lines, as was the fact in the case at bar. The allegation in the plea is, that the appellant was a citizen of the State of Minnesota, one of the States of the United States; that the appellees were citizens of the State of Arkansas, one of the Confederate States; that at the time of the execution and delivery of the note sued on, the United States was at war with the Confederate States; that the appellant adhered to and aided the United States, and that the appellees adhered to and aided the Confederate States; that these acts constituted them public enemies, and that the appellees had neither the sanction or authority of the United States government to make the note, and that, by reason of the want of authority, and of being public enemies, the note is unlawful, illegal, void, etc.

To this plea, the substance of which has been given, a demurrer was filed, one clause of which is general. The question arising upon the record is, *not* whether the appellees have *alleged* that they were public enemies, as the majority seem to infer, but whether *the facts stated in the plea* constitute them public enemies. From the beginning to the end of the plea, there is no allegation that Little Rock, the place where the note was executed, was within the confederate lines. It is true, that Little Rock is in the State of Arkansas, and that the plea alleges that the State of Arkansas adhered to the cause of the Confederate States, and that the appellees aided and adhered to that cause; but what does this establish? Nothing, absolutely nothing; for the court say, that they will take judicial cognizance of the fact, that Little Rock was within the federal lines at the time of the execution and delivery of the note. If the court will take cognizance of such a fact, why not take cognizance of the other fact, that neither the law of nations, reason nor common sense, recognize such a thing as a public enemy, except in a criminal

sense, within the lines over which the government has re-established its authority, as it had at Little Rock? There is no answer to the proposition, unless it be assumed that the State of Arkansas and its people were public enemies until April 2d, 1866, when the President, by proclamation, declared the insurrection at an end.

If such an assumption be indulged in, it follows that the action of the State of Arkansas, from the early part of 1864, until July of 1868, is a nullity. The XIII and XIV Amendments, to the Constitution of the United States, were submitted to a legislature selected and convened under the Constitution of 1864; under such circumstances, will any man, but a member of the Rip Van Winkle school, say that the government of the United States did not recognize the existence of, and re-establishment of the power and authority of its own government? My idea is, that the plea, if it can be sustained at all, should have stated that the appellees *were within the rebel lines* at the time of the execution and delivery of the note. The general rule is, that courts will not give any greater force and effect to a pleading than the language used, will, by a fair construction, authorize. In short, no presumptions are indulged in favor of the pleader.

It was the duty of the appellees to have stated, not that they were public enemies, but the facts and acts which constituted them public enemies. The facts and acts being stated, it is the duty of the court to ascertain from such facts and acts, whether they, in fact, constituted the persons recited, public enemies of the United States. In this view, the majority of the court disagree with me, and contend that the assertion that the appellees "were public enemies," at the time of making the note, is an allegation of *a fact* in the plea, and that a general demurrer admits such an assertion as a *fact*. This, I think, is a grave error, as I understand the demurrer to admit, that the fact the appellant was a citizen of the United States, and of the State of Minnesota, and adhered to that cause, and that the appellees were citizens of the State

of Arkansas, adhering to the confederate cause, did not constitute them public enemies. I regard the assertion, in the plea, that the appellees were public enemies, *not as the allegation of a fact*, but rather as a *conclusion of law*, arising in the mind of the pleader from the facts he had previously stated.

Had the pleader alleged that the note was made *within the lines of the rebel army*, and this fact had been admitted by a demurrer, then I admit that the plea ought to have been sustained; but there is no such allegation. There is no allegation as to where the appellees resided at the time of making the note. The plea admits it was executed and delivered at the city of Little Rock. The presumption arising from this fact is, that the appellees resided there; for in law, a man is presumed to be at the place the record last finds him. This presumption has to be overcome by a direct allegation, and in order to do this, in the case at bar, if the appellees desired to show they were public enemies, it was their duty to make such an allegation as would show, affirmatively, that their residence was within the confederate lines. An allegation that they were citizens of the State of Arkansas, does not negative the fact that they were inside of the lines of the federal army which, the majority say they will take judicial notice, extended over the city of Little Rock, and a very considerable portion of the State. The majority of the court, however, in their desire to aid a man who flaunts his treason in their face as a reason why he should not pay his debts, reverses the rule that a plea shall be construed most strongly against him who pleads it, and say that their judicial cognizance of the fact that Little Rock was held and occupied by federal troops, from September, 1863, to the present hour, will not be indulged in, against a direct averment of the plea, that these appellees were public enemies, and that they will indulge the presumption, that the appellees were public enemies, because they say so, and that too, in the absence of any allegation from which such a conclusion can be drawn.

There is not a member of this court, nor a member of this

bar, but knows, as a matter of public history, that the rebel confined in prison at the city of Little Rock, in February of 1865, had the same right, and exercised it without any molestation on the part of the government of the United States, to employ counsel that a loyal man had. Yet, in the face of such knowledge, and the existence of such permission, the majority of the court have sustained a plea, the contents of which are known to be false, and contradicted by the public history of the times.

So far as the appellant and appellees are concerned, I care no more for them than I do for that portion of the human family with which I have no acquaintance. It is the precedent established by the decision to which I object, and which has led to this dissent. It has been solemnly announced from this bench, as I understand the opinion of the majority, that all transactions and contracts had and executed in the State of Arkansas, by a loyal citizen on the one side, and a rebel on the other, prior to the 2d day of April, 1866, are void, unless special permission was given the rebel to make the contract. I do not believe this to be the law, yet it has been so declared from this bench.

I might go into an extended argument, and support it by the best law writers on international law, that the employment of counsel for the defense of a criminal, did not come under the head of "commercial intercourse," when restricted to the facts in this case, but it is unnecessary, and I am content to let the matter rest on what has already been said.