GARRETT *v.* FAUBUS, GOVERNOR.

5-1824

Concurring opinion delivered April 27, 1959.

SAM ROBINSON, Associate Justice. I concur for the purpose of setting out in detail the reasons for my conviction that Act No. 4 of the Extraordinary Session of the General Assembly for the State of Arkansas for 1957 violates neither the Constitution of Arkansas nor the Constitution of the United States.

The first question is whether Act No. 4 violates Article 14 of the Constitution of Arkansas of 1874, copied

from the Constitution of 1868, providing that the State must maintain free public schools. Does this provision of the Constitution mean that in any and all circumstances free public schools must be maintained? Does this provision of the Constitution mean that the State of Arkansas must maintain integrated schools? We know from the history of the times and particularly of the year 1874, when the present Constitution of Arkansas was adopted, that it was not the intention of the people to compel he State to support integrated schools. The meaning of constitution guaranties never varies. *Village of Euclid, Ohio* v. *Ambler Realty Co.*, 272 U. S. 365, 71 L. Ed. 303, 47 S. Ct. 114.

No one will deny that prior to 1874 there had been no integration of the races, in schools or otherwise, in the State of Arkansas. As shedding some light on the subject, the Arkansas Constitutional Convention of 1868, although composed to a large extent of people unfriendly to the customs and traditions of the people of this State, went on record as being opposed to any amalgamation of the races. Notwithstanding that those who appear to have been in control of the 1868 Constitutional Convention, as shown by the debates and proceedings of the Convention, were lately from Ohio, Canada, New Jersey, Iowa, Pennsylvania, Indiana, New York, Illinois, Scotland, the District of Columbia, England, and other states, and even though there was warm discussion in the Convention as to whether the Constitution of 1868 should contain a provision prohibiting marriages between races, there is no indication whatever that any member of the Convention thought there should be integrated public schools.

The Convention, on February 5, 1868, adopted a resolution as follows: "RESOLVED: That this Convention is utterly opposed to all amalgamation between the white and colored races, whether the same is legitimate or illegitimate. We would, therefore, recommend that the next General Assembly enact such laws as may effectually govern the same." By amalgamation the resolution has some meaning other than intermarriage between the races, because there was already in force and

effect, and had been since February, 1838, a statute which is still in force and effect and which provides: ''All marriages of white persons with Negroes or mulatoes are declared to be illegal and void.'' Rev. Stat., Ch. 94, § 4.

In 1895, in the case of *Dodson* v. *State*, 61 Ark. 57, 31 S. W. 977, the validity of the intermarriage statute was challenged on the ground that it had been repealed by implication by the Constitutions of 1864, 1868 and 1874 and the Fourteenth Amendment to the Constitution of the United States. The contention of unconstitutionality of the statute was based on the equal rights and privileges of citizenship and that the making of contracts is one of the rights and privileges of a citizen, and that a marriage being in the eyes of the law only a civil contract, the right and privilege of entering into such contract could not be lawfully abridged. In refusing to follow this reasoning, Chief Justice BUNN, writing the opinion of the Court, said: ''It is not true that marriage is only a civil contract. It is more than that. It is a social and domestic relation, subject to the exercise of the highest governmental power of the sovereign state—the police power. . . . Nor does the continued existence of the prohibitory act depend on the rather uncertain foundation that its repeal cannot be asserted because, although in spirit repealed, yet, since this is only by implication, it must stand. The act is on a more solid foundation than that. If repealed in the way contended for, it involves a surrender by the people of one of the attributes of sovereignty. That cannot be attributed to the people, unless made by express declaration, if at all.'' The validity of the statute prohibiting intermarriages by members of the Negro and White races was upheld.

Maintenance of schools by the State means something more than teaching ''the three R's''. It forces a social status on the children. The manner of the operation of public schools necessarily compels social contacts by the students. There are many extracurricular activities involving social contacts that are necessary functions of schools, such as dramatics, where the students are subject to very close social contacts, athletics,

school cafeterias, dances, P.T.A. meetings, and other social activities in which the students are more or less compelled to participate.

It has always been the practice in this State to maintain separate schools for White and Negro students, and so far as we have been able to ascertain, this is the first time it has ever been contended in any state court that our Constitution compels the State to maintain integrated schools. This is the first time this Court has been called upon to say whether such construction should be placed on the Constitution. The federal courts, however, have heretofore had occasion to construe our Constitution, Article 14, and Ark. Stat. § 80-509, dealing with public schools. It was held, in *Pitts* v. *Board of Trustees of De Witt Spec. School Dist.*, 84 F. Supp. 975, that our statute, § 80-509, providing for separate schools for White and Colored persons, is not contrary to Article 14 of the Constitution of Arkansas.

Not only do we have segregated public schools, but we have separate industrial schools for Negro boys and White boys, and a Negro girls' training school, and a like school for White girls; and other public institutions in the State are segregated, such as the blind schools, the schools for the deaf, the State penitentiary and the State tuberculosis sanatariums.

Long acquiescence of policy pursued in every county in the State, and acts of the Legislature on the subject, are not without compelling force in reaching a conclusion as to the intention of the people when the Constitution was adopted. *Laurel Hill Cemetery* v. *City & County of San Francisco*, 216 U. S. 358 54 L. Ed. 515, 30 S. Ct. 301. The Constitution belongs to the people. They can do what they like with it—they can amend it, they can repeal it, and they can construe it. Here the Court has the rare benefit of the constitutional provision under consideration having been construed by the people. The people have a right to say what the Constitution means, and in no uncertain terms, by means of Amendment No. 44, initiated and adopted by the people in 1957, and by the 1957 resolution adopted by the people, they have

clearly shown that no provision of the Constitution of this State means that the State must maintain integrated schools. Amendment No. 44 and the Interposition Resolution of 1957 are set out in full as an appendix to this concurring opinion. Especially pertinent parts of the Amendment and the Resolution are as follows:

Amendment No. 44 provides:

"§ 1. Action by general assembly to protect states' rights.—From and after the Adoption of this Amendment, the General Assembly of the State of Arkansas shall take appropriate action and pass laws opposing in every Constitutional manner the Un-Constitutional desegregation decisions of May 17, 1954 and May 31, 1955 of the United States Supreme Court, . . .

". . .

"§ 3. Regulation of health, morals, education, marriage and good order.—The General Assembly shall enact such laws under the Police Powers reserved to the States as may be necessary to regulate health, morals, education, marriage, good order and to insure the domestic tranquility of the citizens of the State of Arkansas.

". . .

"§ 5. All parts of the Constitution of the State of Arkansas in conflict with this Amendment be, and the same are, hereby repealed."

The Interposition Resolution provides:

"The People of Arkansas assert that the power to operate public schools in the State on a racially separate but substantially equal basis was granted by the people of Arkansas to the government of the State of Arkansas; . . .

". . .

"The legislative executive and judicial powers of the United States as granted under the Constitution shall not be construed to extend to the regulation of the public schools of any State nor to include a prohibition to any State, in the exercise of its power, to provide by its

laws for the establishment, operation and maintenance of racially separate but substantially equal public schools within such State.''

Amendment No. 44 is just as much a part of the Constitution as if it had been a part thereof from the first. I don't see how anyone can read it and the Resolution of Interposition adopted by the people and then say that under the Constitution of Arkansas this State must provide and support integrated schools. In my opinion such construction by the Court would be judicial usurpation of unauthorized power.

The next question is whether Act No. 4 violates the Constitution of the United States or the amendments thereto. By its decision in *Brown* v. *Board of Education*, 347 U. S. 483, 98 L. Ed. 873, 74 S. Ct. 686, and the other cases decided simultaneously therewith, the Supreme Court of the United States did not intend to abolish the police powers of the State. In the *Brown* case and others decided at that time, the Court was dealing with facts in those cases, which were entirely different from the facts presented in the case at bar. The courts may take judicial knowledge of certain things that transpired in connection with the attempt to integrate a Little Rock public school. In *Rice* v. *Shook*, 27 Ark. 137, this Court said: ''The Court will judicially notice that, at the date of the note, Little Rock and a large part of the State were and had been, for some considerably time previously, in possession of the forces of the United States.''

An attempt to integrate a school in Little Rock brought about intolerable conditions. When the attempt was made to integrate one school by sending nine Negro students to a White school there was such a violent reaction on the part of the people that it was deemed necessary by the President of the United States to muster into federal service the Arkansas National Guard to reinforce a division of crack first-line United States troops, fully armed, sent to Little Rock to restore and maintain order. The troops were stationed at the schools, in the buildings and on the grounds, and armed soldiers pa-

troled the streets. The soldiers kept order for months, at a cost to the people of about $5 million.

At the end of the semester during which the Negro students were kept in the White school, in the spring of 1958, it was thought there would be another effort to integrate the schools in the fall, and in anticipation of the violence that placing the Negro students in the White school would engender, dozens of men were sworn in as Deputy United States Marshals, and also Deputy United States Marshals from other districts were sent to Little Rock, and all of them were given special training to cope with the violence that it was thought would occur when another effort was made to send Negro students to the White school. Nearly $400,000 of the people's money was spent in getting the Special United States Marshals ready to handle the anticipated violence. It is not known whether they were to work in connection with the troops or as a separate unit.

In the meantime, the State of Arkansas was taking measures to deal with the situation and prevent bloodshed, and a special session of the Legislature passed Act No. 4, now under consideration. In order to prevent violence that would be brought about by sending the Negro children to White schools, and to prevent the use of armed troops in the school buildings and on the school grounds, the Legislature authorized the Governor to close the school affected. But, undoubtedly, the General Assembly felt that if a majority of the voters, including Negro voters (who constitute a large percentage of the total electors in Little Rock), felt that the schools should be opened, then the schools could be conducted without the use of troops and United States Marshals. Act No. 4, therefore, provides for an election to determine if the people wanted the schools opened. Such an election was held, and the vote was overwhelming in favor of keeping the schools closed.

Now, the question is whether in the existing situation Act No. 4 is valid under the police powers of the State. If the State cannot close schools under conditions we know existed in Little Rock when an attempt was made

to integrate a school, then neither can the State close the schools when any other dangerous condition exists, and the police power, one of the few rights left to the States, is gone, perhaps forever.

The Virginia case of *Harrison* v. *Day,* 106 S. E. 2d 637, is no precedent for the case at bar. In the Virginia case it is clearly stated: "It will be observed that the stated purpose of the plan embodied in these acts is to prevent the enrollment and instruction of white and colored children in the same public schools." Our Act No. 4 is clearly for the purpose of preventing violence and bloodshed. If there had been no violence and no bloodshed and no use of United States troops in connection with the operation of the Central High School in Little Rock, obviously Act No. 4 would never have been adopted. The assertion that the adoption of Act No. 4 was for the purpose of preventing racial integration of the schools under any circumstances is completely refuted by the fact that the University of Arkansas was integrated a long time before the decision in the *Brown* case. Such integration was not compelled by any court. There has been integration of other schools, such as the ones at Hoxie, Van Buren, Fayetteville, and perhaps others, but the schools were not closed by the Governor under authority of Act No. 4 because it was not necessary. There was no violence at those places. Act No. 4 grew out of the violence and use of troops and it was adopted to prevent such an occurrence in the future. If the State cannot use its police powers to prevent violence and bloodshed and when conditions are chaotic, thereby making necessary the use of United States troops and the National Guard to restore and maintain order among the people, then the State has no police power.

Without attempting to go into a long dissertation on the police power of the States and its scope, I merely quote from what the United States Supreme Court and other authorities have said on the subject: "It has repeatedly been held that no provisions of the Federal Constitution and none of the amendments added to that instrument were intended or designed to interfere with the

police power of the various states." 11 Am. Jur. 986. "In accordance with the settled principle that no part of the Federal Constitution was intended to hamper a valid exercise of state police regulation, it is particularly established by overwhelming authority that the Fourteenth Amendment was not designed to interfere with, and does not interfere with, curtail, restrain, destroy, or take from the states the right duly and properly to exercise the police power. Furthermore, this amendment does not limit the subjects upon which the police power of a state may be exerted." 11 a.m. Jur. 995-7.

In a letter to Mr. Duff Green, President Lincoln said: "The maintenance inviolate of the rights of the states, and especially the right of each state, to order and control its own domestic institutions, according to its own judgment, exclusively, is essential to the balance of powers upon which the perfection and endurance of our political fabric depend."

"It is settled by repeated decisions of this Court that the equal protection clause does not take from a state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary." *Whitney* v. *California*, 274 U. S. 357, 71 L. Ed. 1095, 47 S. Ct. 641. "If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the State. . . . Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to the class of objects which demand the application of the maxim, *salus*

*populi suprema lex* (Let the welfare of the people be the supreme law); and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself. *Boyd* v. *Alabama,* 94 U. S. 645.'' *Beer Co.* v. *Massachusetts,* 97 U. S. 25, 24 L. Ed. 989.

''But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.'' *Mugler* v. *Kansas,* 123 U. S. 623, 660, 31 L. Ed. 205, 8 S. Ct. 273. In that case the Court further said: ''No one may rightfully do that which the law-making power, upon reasonable grounds, declares to be prejudicial to the general welfare. This conclusion is unavoidable, unless the Fourteenth Amendment of the Constitution takes from the States of the Union those powers of police that were reserved at the time the original Constitution was adopted. But this court has declared, upon full consideration, in *Barbier* v. *Connolly,* 113 U. S. 27, 31, that the Fourteenth Amendment had no such effect. After observing, among other things, that that Amendment forbade the arbitrary deprivation of life or liberty, and the arbitrary spoilation of property, and secured equal protection to all under like circumstances, in respect as well to their personal and civil rights as to their acquisition and enjoyment of property, the court said: 'But neither the Amendment — broad and comprehensive as it is—nor any other amendment,

was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, *education,* and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity.' '' (Italics ours)

Cases without number could be cited to the same effect. But it might appear to be an act of supererogation to cite here the innumerable cases wherein the Supreme Court of the United States has held that the police power of the States was not impaired by the Fourteenth or any other amendment. In *Otis* v. *Parker,* 187 U. S. 606, 608, 47 L. Ed. 323, 23 S. Ct. 168, Mr. Justice HOLMES said: ''While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions or morality with which they disagree. Considerable latitude must be allowed for differences of view as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all English-speaking communities, would become the partisan of a particular set of ethical or economical opinions, which by no means are held *semper ubique et ab omnibus* (always, everywhere and by all). *Even if the provision before us should seem to us not to have been justified by the circumstances locally existing in California at the time when it was passed, it is shown by its adoption to have expressed a deep-seated conviction on the part of the people concerned as to what the policy required. Such a deep-seated conviction is entitled to great respect.''* (Italics ours)

No one contends that the people of Arkansas do not have the right to abolish the entire public school system if they so desire. Certainly under its police power the State has the authority to close a school to prevent violence and bloodshed and where, if the school were maintained, the teachers and students would have to take or-

ders from soldiers with fixed bayonets, and Deputy United States Marshals.

## APPENDIX
### AMENDMENT NO. 44

"§ 1. Action by general assembly to protect states' rights.—From and after the adoption of this Amendment, the General Assembly of the State of Arkansas shall take appropriate action and pass laws opposing in every Constitutional manner the Un-Constitutional desegregation decisions of May 17, 1954 and May 31, 1955 of the United States Supreme Court, including interposing the sovereignty of the State of Arkansas to the end of nullification of these and all deliberate, palpable and dangerous invasions of or encroachments upon rights and powers not delegated to the United States nor prohibited to the States by the Constitution of the United States and Amendments thereto, and those rights and powers reserved to the States and to the People thereof by any department, commission, officer, or employee of such department or commission of the Government of the United States, or of any government of any Nation or Federation of Nations acting upon the apparent authority granted them by or assumed by them from the Government of the United States. Said opposition shall continue steadfast until such time as such Un-Constitutional invasions or encroachments shall have been abated or shall have been rectified, or the same shall be transformed into an Amendment to the Constitution of the United States and adopted by action of three-fourths of the States as provided therein.

"§ 2. Statutes for administration and enforcement of amendment—Appropriations.—The G e n e r a l Assembly shall enact laws to insure the administration and enforcement of the spirit and letter of this Amendment; and shall appropriate adequate funds to effect the same, including a proportionate share of such expenses as may be necessary for the maintenance of regional committees created among the States for the preservation of rights belonging to the states and the people thereof.

"§ 3. Regulation of health, morals, education, marriage and good order.—The General Assembly shall enact such laws under the Police Powers reserved to the States as may be necessary to regulate health, morals, education, marriage, good order and to insure the domestic tranquility of the citizens of the State of Arkansas.

"§ 4. Public officers and employees—No immunity for violation of laws enacted under amendment—Forfeiture of office for violations.—No public official or employee of the State of Arkansas or of any political subdivision thereof shall have immunity from arrest, prosecution and trial for the violation of such penal laws as the General Assembly shall provide for the willful failure and refusal to carry out the clear mandates of this Amendment; and in addition to the penalties provided for by the General Assembly, shall automatically forfeit his or her office.

"Repealing Clause. Section 5 of Amendment No. 44, read: 'All parts of the Constitution of the State of Arkansas in conflict with this Amendment be, and the same are, hereby repealed.' "

---

## ARKANSAS RESOLUTION OF INTERPOSITION

"BE IT RESOLVED AND ENACTED BY THE PEOPLE OF THE STATE OF ARKANSAS:

"The people of the State of Arkansas express their firm resolution to maintain and defend the Constitution of the United States and the Constitution of the State of Arkansas against every attempt, whether foreign or domestic, to weaken or destroy the structure of the State and federal governments.

"The People of Arkansas will ever defend and maintain the fundamental principle of our basic laws by which certain powers were delegated by the people of the separate states to the governments of the separate states while other specifically enumerated powers, not

delegated to the separate states or reserved to the people, were delegated to the federal government. The State has never delegated to the Supreme Court of the United States the power to change the Constitution of the United States.

"The People of Arkansas assert that the maintenance inviolate of the rights of the States, and especially the right of each State to order and control its own domestic institutions according to its own judgment exclusively, is essential to that balance of power on which the perfection and endurance of our political faith depends.

"The People of Arkansas assert that the power to operate public schools in the State on a racially separate but substantially equal basis was granted by the people of Arkansas to the government of the State of Arkansas; and that, by ratification of the Fourteenth Amendment, neither the State of Arkansas nor its people delegated to the federal government, expressly or by implication, the power to regulate or control the operation of the domestic institutions of Arkansas; and any and all decisions of the federal courts or any other department of the federal government to the contrary notwithstanding.

"Therefore, The People of Arkansas, By Popular Vote:

"1. Respectfully appeal to all the people of the United States and to the governments of all the separate states and request them to join the people of Arkansas in taking steps, pursuant to Article V of the Constitution of the United States, by which the Constitution of the United States be amended so as to contain a provision substantially as follows:

'The legislative, executive and judicial powers of the United States as granted under the Constitution shall not be construed to extend to the regulation of the public schools of any State nor to include a prohibition to any State, in the exercise of its power, to provide by its laws for the establishment, operation and maintenance of ra-

cially separate but substantially equal public schools within such State.'

"2. Pledge our firm intention to take all appropriate measures, honorably and legally available to us, to resist any and all illegal encroachments upon the powers reserved to the State of Arkansas to order and control its own domestic institutions according to its own exclusive judgment.

"3. Urge upon the separate States and the people thereof their prompt and deliberate efforts to prohibit any further encroachments by the Federal government upon the powers reserved to the separate states and the people thereof."